Good morning. Welcome to the Sandra Day O'Connor Courthouse. It's a pleasure to be here this morning. Most of our cases have been submitted on the briefs and I will review those briefly at this time. The case of Cecilio Costanzo Morales versus Pambondi has been submitted on the briefs as well as the case of Leonardo Bedoya Corona versus Pambondi and the case of Nestor Balanzar Salas versus Pambondi and the case of Moises Ortiz Garcia versus Pambondi. Those cases have been submitted on the briefs as well as the case of Edgar Javier Solorio Manso versus Pambondi. So the case set for oral argument this morning is the case of Cross First Bank Kansas Banking Corporation and Nancy Hanna versus Vieste SPE, LLC. Herbert J. Sims and Company Inc. and William B. Sims. Counsel are ready to proceed. You may come forward. Good morning. I may please the court. My name is Jeff Goulder. I'm here with my partner Michael Vincent appearing on behalf of the plaintiff's appellants. My goal is to reserve five minutes for rebuttal. Of course, I mean no disrespect to either of the district court judges that have handled this case, Judge Bolton or Judge Reyes, but we believe that both committed reversible error. Unless the court prefers otherwise, I intended to start with Judge Bolton's order on the motion to dismiss. The most direct path. And maybe it's me, I'm just having a little trouble hearing. Can you speak or bring the microphones up to you, please? Is that better? That's better. Thank you. What I was saying was the most direct path to reach the conclusion that Judge Bolton erred is simply this. Both Judge Bolton and Judge Reyes reviewed the same documentation and that is the 2014 notice and the 2015 notice as defined in Judge Bolton's order. Judge Reyes concluded based on that information that there was not sufficient evidence that Vieste was at fault. Judge Bolton, based on that same evidence, reached the different conclusion that there was sufficient evidence of fraudulent practice such that the statute of limitation against Vieste started to run. That in and of itself, two district court judges viewing the same information reaching contrary conclusions, I think establishes that there is a question of fact regarding accrual of the statute of limitations such that the case should proceed. There are other reasons. I'm not sure I understand that argument. I'm not sure it's your best argument either, but let me probe it for a second. As I understand it, Judge Bolton found that several things should have put the plaintiffs on inquiry notice that the statute of limitations had begun to run. Judge Reyes found with respect only to the common law claims that there was no evidence of reliance on any misrepresentation. So given those two rulings, I'm having some difficulty figuring out why they conflict with each other. Judge Reyes didn't say the defendants were perfectly free, had not done anything wrong. He just simply said there was no reliance on any misrepresentation. Well, I thought that Judge Reyes said something different. Well, if he did, you have to point out to me where he says it because his ruling is really restricted to the notice of reliance, I think. Am I wrong about that? I'm at page ER9 at line 17 and 18, which is Judge Reyes's ruling on summary judgment. He writes, it was not clear from the EMA notices that Vieste was in the wrong. Judge Bolton concluded that it was clear from the EMA notices that Vieste was in the wrong. So let's go back to Judge Bolton's ruling for a second, because as I understand your position, you wouldn't have been able to know whether you had a claim in this case until there was a ruling in the state court litigation, correct? You're correct. So I want to ask, I want to pose a hypothetical to you. Let's assume there had only been the 2014 notice from Standard & Poor's and no litigation had ensued. Would the statute of limitations ever have begun to run in your view? This 2014 notice did not provide sufficient notice of fraudulent conduct. Well, why not? Why not? Thank you. First, if I can ask, why not? May I dive into the content of the 2014 notice? If Judge Hurwitz would allow that. Sure. All right. This is what Judge Bolton had to say. Now tell me what the notice said, not what Judge Bolton said. The 2014 notice downgraded the bonds because it appeared that there was a controversy about whether or not, I'm going to use the term without capital letters, yard waste, to be separated. And shouldn't that have put the plaintiffs on inquiry notice that there might be a problem here? Even if it put the plaintiffs on inquiry notice, inquiry notice isn't enough. But the fact that the bonds were downgraded simply means that there was a payment problem with the project. The fact that there was a downgrade does not reflect on which party, Fiesta or the city of Glendale, was in the wrong in terms of. Right. And that's why I'm asking the question. So let's assume that parties never ended up in litigation. Would the statute of limitations still be running, not have begun running today if a lawsuit were brought? I mean, the reason I'm asking is your argument seems to be based on the notice that we have a notion that we have to wait till the end of a lawsuit for the statute of limitations to begin running. So I was trying to take the lawsuit out of it. And I have the lawsuit out of it. I take it. Your position has to be that you could suit could be brought today because the statute never would have begun to run. Judge Hurwitz, we have a unique situation here where you have two parties, Glendale and Biesta. One is right. One is wrong. And they're both pointing fingers at one another. So different from the hypothetical you just know, that's why I'm asking you the hypothetical. So let's assume that the lawsuit never begins. You know, there's a dispute between the parties about this, about what the contract provides, but they never sue each other. And if they never sue each other, then it must be your position that the statute of limitations never begins to run. It is my position that the statute of limitations didn't begin to run in 2014 based on what we knew at that time. But your position, it seemed like from the briefing, was that it only could have run until there was a decision in state court. And before then, there was no way. I think from what I'm understanding from your briefing, because I'm not hearing that from you here exactly today, was that. I think that we're supposed to look at when you would have suspected with reasonable diligence. And I'm trying to understand why what happened in July, October of 2014 and July of 2015 isn't sufficient to put you on notice and to start the accrual of the Arizona Securities Act. It seemed like in your briefing, you made the argument that you could not have known who made representation in the official statement from the notices between October and July, October 14 and July 15. But I think it seems like only V.S. State made representations in the official statement. So I don't know how that argument works for you. And I'm going based on the briefing because it sounds like you're maybe arguing something different here today. Because only V.S. State could have been the party that made the misrepresentation. But that doesn't mean that only V.S. State was a prospective defendant. In other words, there would have been a claim against the city of Glendale for negligence, for example, if it entered into a waste supply agreement and violated the agreement knowing that there were bondholders that bought. So the point I'm trying to make is, based on the facts that were presented with, where we have underlying litigation, each party pointing the finger at the other, the plaintiffs know one party is not at fault. But it seems like a bit of an odd theory to say that only when a court determines the outcome of litigation and the arbitrator went one way and then the state court goes another way and the parties both think they have good faith positions, to then say, well, when that's over now, I retroactively know that there were false statements at the time of the bonds issuance. That's a very odd theory, isn't it? It's a unique situation, Judge Collins, because as I said, we had two parties. We know they're both not both of them are at fault. Only one is at fault. So I'm not asking the court to announce some broad decision regarding. I think what we're getting at here with the various lines of questioning is that the facts are what the facts are. And what a court ultimately decrees about a party's good faith dispute that went one way versus the other can't be what controls the statute of limitations. It has to be what the underlying facts are that could have been discovered by a reasonable person on inquiry notice after the substantial downgrade of the bonds to a notch above jump. You're exactly right. It's when a reasonable person would have known. And in this case, under these facts, but that's once you know that the bonds have been downgraded to a point where there's worry that this is going to be an economically viable project. It isn't a reasonable person isn't on inquiry notice that she may be all that stuff they said in the official statement wasn't, you know, wasn't on the up and up. I come back to the point I made with Judge Hurwitz. Judge Collins, you use the term inquiry notice. Judge Reyes concluded we were on inquiry notice, but he still concluded that the statute that the cause of action had not yet accrued. So in the worst case, the bond downgrade provided inquiry notice that there was a problem with the project. But there was nothing about the bond downgrade or anything else in the 2014 notice or the 2015 notice that indicated who was at fault for the problems that the project was confronting. Maybe this will help. There were two fundamental misstatements with this project. One was that this facility was a recycling facility, that it was built as a recycling facility. And the second was that Vieste and Glendale had entered into a contract to receive the sort of waste that a recycling facility could handle. Neither one of those things turned out to be true. That is, the facility that was built was not a recycling facility at all. Because Vieste had never communicated to its building contractor that the use of the project has changed. The contractor built an incinerator. We didn't know that. We could not have known what the contract between Vieste and its builder held until after the Glendale litigation concluded, because that was not public knowledge. That was not public information. The other thing that we did not know and could not have known is what did the waste supply agreement mean? We knew what it said. S&P knew what it said. S&P didn't pick up on the fact that there was some disconnect in terms of the definition of yard waste with the capital letters and yard waste with lowercase letters. S&P rated the bonds A+. So it is not a valid argument for the defendants to say, you bond buyers had access to the waste supply agreement. You should have acted like lawyers and judges and determined for yourself what it meant. With respect to the first of the two misrepresentations that you identify, doesn't the 2014 S&P notice indicate that Vieste had decided that it had to retrofit the facility and change it in order to do what it wanted to do? So weren't you on at least notice at that point that the facility couldn't do what you thought it could do? We were on notice that the facility couldn't process the sort of waste that it was receiving. We were not on notice why that happened and who was at fault for it. That's the second part of your – so you said there were two misrepresentations. One was that the facility they built couldn't do what it was represented to do. I'm looking at the 2014 S&P notice and that says Vieste has decided that it would have to retrofit the facility in order to accomplish what it wanted to do. So certainly you were on notice at that point of that problem, weren't you? We did not know what Vieste had contracted to build. I will grant you, Judge Hurwitz, that we were on inquiry notice of a problem. But we did not know and could not have known that in fact Vieste never even built the sort of facility that it intended to build, which was a recycling facility. But weren't you also on notice that the city of Glendale would not pre-sort the waste to remove yard waste? And then there was the litigation before the state court in which the state court found that there was no provision in the agreement between Glendale and Vieste that required Glendale to remove yard waste from its deliveries to the recycling facility. And only Vieste made, from my reading, made representations in the official statement. So I just wanted to give you an opportunity to tell me why these notices are not sufficient for the plaintiffs to suspect that due to the yard waste dispute that Vieste had misrepresented the facility's design and its ability to generate the revenues. Thank you, Judge McGill. Let me take you up on that suggestion or invitation. I'm looking at the notice to bondholders, which is the 2015 notice. I'm at page 890. The bottom paragraph, this is Superior Court Judge Bergen. She writes, as a preliminary matter, there is no provision in the WSA that explicitly requires the city to remove unacceptable waste types. That's what Judge Bolton cited in her ruling. But that's not the end of the sentence. The rest of the sentence says, or that explicitly allows the city to deliver both acceptable and unacceptable waste types. In other words, Judge Bergen was saying this contract doesn't answer the question. She was saying that there is not an explicit statement in the contract that resolves the issue. To my mind, holding out the possibility of extrinsic evidence to be used to interpret the contract, of course, the bond buyers were not parties to any negotiations of this contract. They have no knowledge of any extrinsic evidence. All they can do is look at the waste supply agreement to the extent bond buyers even have an obligation to do that and note the same thing that Judge Bergen noted, which is the contract doesn't explicitly answer the question. I think you're at 3 minutes and 24 seconds. Did you want to reserve that time? Thank you. Thank you. Good morning. My name is Hudson Smiley. I'm here from Dow Hetherington for H.J. Sims and Company and Timothy Zan Smith. I wanted to, I think you've, and I'm going to try to focus on the motion to dismiss that was granted and my colleague will speak to the summary judgment. You're asking the same questions I've been asking. And it's really this. Did these plaintiffs who were certainly very sophisticated folks who had to be qualified institutional buyers and all that stuff in order to even buy these bonds, did they have to sit on their hands for years, hoping that a court might rule on the WSA? In hindsight, it did rule. But in 2015, you don't know if that's ever going to happen. It's just like, sort of like the hypothetical that was presented. What if there wasn't any litigation? What if the litigation settled? What if there's never a ruling? And I think the answer is really this. Their allegations of specific misrepresentations don't live or die on how the state court ultimately rules on the WSA. Their allegations include, just to highlight some, that Vieste misrepresented its experience with like projects. Let me ask you, because this seems to be at the center of both sides' arguments. What do you think the test is under Arizona law for when a statute of limitations begins to run? I mean, obviously, it normally begins to run when an injury occurs, but we're dealing with discovery in these cases. Both sides seem to joust a little bit about what the Arizona test is. Tell me what you think the Arizona test is. I'll tell you what I think it is. I think it starts with the statute under the ASA, because it's known or should have known of a fraudulent practice. So we start there. You've got to know of a fraudulent practice, not necessarily causation. And I take it this case turns on should have known, because that's what Judge Bolton sort of says. So I'm trying to figure out what does should have known mean under Arizona. Yeah, right. It's one of my list of questions. How much do you know before you know? And I think the answer under Arizona Supreme Court law from 2024, the Satamian case that we've cited in our brief, no, it wasn't. Sorry, it was not an ASA case. But it's when you had enough information to file your claim. It was when you had an idea that someone was a potential defendant. It's not, as we see in certain places in the plaintiff's brief, when they know something unequivocally. Well, but what they're saying, and this makes a little bit of procedural sense, is that all they really knew in 2014 and 15 was that somebody had misrepresented something, whether it was the city of Glendale or Fiesta. And should they have sued both of them at the time? I think that was a possibility. I think they knew more than just that somebody might have made a misrepresentation. You back up from this big picture. Fiesta had one job to which all the other things it was going to do were somewhat peripheral. It needed to make sure Glendale, the only possible source of the right kind of waste, was not only willing but capable financially and technologically to deliver the waste. And then it needed to do a contract that unequivocally, explicitly required them to do that. Nothing else would matter if that wasn't done. And having the agreement in place just by itself isn't enough. Even if Fiesta had won the lawsuit in the state court years later, all of their claims still stand. The fact that the agreement was poorly drafted, took years of litigation, would be support or evidence for their having misrepresented their experience in this kind of project. So the claims don't ultimately turn on that issue. But back to how much did they need to know? If they had enough, and the court, Judge Bolton had sided and relied on Aaron V. Frumpkin, that case used the language of, because there was a court ruling in that case out of the bankruptcy court, and that's what they had relied on. And the court said, no, you knew sooner because you suspected the fraud sooner. You had reason to suspect the fraud sooner. That was the language used. Because sometimes the briefs talk about suspicion, and sometimes they talk about should have known, and the language in the ASA is should have known. But the language in some of the Arizona cases talks about reasonable suspicion. So I'm trying to figure out what Arizona tests were supposed to apply to this. I think the Arizona case law isn't 100 percent consistent on that. But I think from the Supreme Court of Arizona, that Satamian case in 2024 captures the idea. When did you have enough information to plead your claim? Arizona has well-established pleading rules. You don't have to make a prima facie case. We had cited that in our brief. There's a case called Boone that we had cited. But basically, you do enough investigation that you can allege these claims that aren't clearly groundless or frivolous. We have a discovery process that allows you to discover more facts. But what's clear under the Arizona rule announced or really said again in Satamian, you don't have to have all the facts. You don't have to have all the evidence. What Satamian says is there must also be reason to connect the what to a particular who in such a way that a reasonable person would be on notice to investigate whether the injury might result from fault. So what is it that establishes the connection here to the particular who as of what time? Yeah, I think, of course, that's in a different context than the ASA. But I think the gist of it still applies here because under the ASA. Do you think the standard for the statute of limitations is different for the ASA than for the common law claims? I think it requires less and it requires less because the elements are less. This was a statutory claim that was made to be much simpler than even attend the five claim. You don't have to prove damages. You don't have to prove intent. You do have to prove materiality. And in the remedies, the just so I understand your position, Craig, that the elements of the discovery rule are the same. The difference comes from the fact that they were applied to different underlying elements of the causes of action that produces a different ultimate rule. Exactly. And there are Arizona cases that will make that note that the elements of a particular cause of action play a role in determining accrual. So here it's not when do they know with certainty or unequivocally that Vieste is at fault. They knew this thing was a cluster in 2014 and 15. And as has already been pointed out, Vieste owned the pin on the official statement. If there is a misrepresentation there, it's at their hand. And then what else is important is that, again, those claims, misrepresenting their experience or how deeply they looked into the viability of the facility, whether the facility could be self-sustaining, all the later ruling could do is add another data point of evidence one way or the other. Those things were either false or true back in 2013 when that document was authored. One of the things that sort of seems strange to me in this case is that I'm not sure they would ever have an ASA claim against Glendale because the representations were purported to be made by Vieste and the underwriter. That's right. Because the ASA, as we mentioned earlier, Judge Collins, about the who, the ASA tells you kind of the who. You have to make, induce, and there's one other, you know, you have to fit one of those three and courts don't usually parse those out very carefully. But that kind of identifies the who. Who is that involved? Well, I guess what I'm saying is that the who in this context could only have been the underwriters in Vieste. That's right. It may have been that they didn't do anything wrong. That goes to the other part of the inquiry, which is where you put on notice. But I don't think there was going to be a difficult time figuring out if there was a misrepresentation who made it because the representation was only made by the underwriters in Vieste. That's correct. Because Glendale doesn't have a pin on the official statement. Yeah, the waste supply agreement is attached to it and that's negotiated. But you're absolutely right. It's who wrote this. There is an issuer of the bonds, but they make it clear in the official statement that they really didn't have a pin on the official statement. So I want to go back to the other part of the test. So your position is that the ASA standard, which is new or should have known, is congruent with the Arizona common law standard? I think it is with just the caveat that you have less elements than you have. I understand. But what new or should have known is different. The question is whether it's new or should have known. I think that's right. It's right in the statute. And new or should have known will be based on not looking in a piece of information in isolation like the rating going from A plus to triple B minus. In the aggregate, not only was this thing a complete disaster, it's a revenue bond with no revenue, no recycling, no money coming in. It's a recipe for default on the bonds. And Vieste didn't do that first task. Make sure Glendale can actually do the job and is willing. Can I ask a question? In your briefing, you represent Sims, is that correct? Yes, Your Honor, and Dan Smith. Sims argued that the misrepresentation allegations in the plaintiff's first amended complaint were considerably broader than they are on appeal and then argued that the dismissal of the Arizona Securities Act claims should be reviewed against the broader misrepresentation allegations. I was just trying to figure out what's your best case for this position? Well, my best case for that position is that's what they actually allege in their complaint. And so my point is simply that if you've alleged a whole slew of misrepresentations, you start to realize, you know what, there's a bunch of that I was aware of due to these notices. You start narrowing the claim and say, well, we don't have an explicit statement that the MRF was ill-designed. That was my point. I see now. Just go back to the complaint. Okay. Thank you very much. Thank you. And may it please the court, Todd Feltis, and I'm here on behalf of the VSK entities and four of the five members of the board of managers. I was going to, and in splitting up the time with my colleague, that was going to address the summary judgment issues, but I'm certainly prepared to talk about the motion to dismiss as well. The district court correctly found that the plaintiff did not establish actual reliance. And there wasn't any evidence that was presented in the summary judgment record that anyone actually directly or indirectly relied on any statement made in the official statement. And as we trace back all the evidence of the various people on both the insurance company side and on CrossFirst's side, the reliance evidence comes down really to two individuals, Eric Nelmark, who is the analyst for the insurance company's investment advisor, and David O'Toole, who is the investment officer on behalf of CrossFirst Bank and CrossFirst Investments. And on appeal for the first time, the plaintiffs point to habit evidence and say that the actual reliance can be shown on the habits of Mr. Nelmark. There's summary judgment briefing. I think I read it all. It talks about habit evidence once or twice. I mean, it talks about habit once or twice in the course of what I think is 47 pages of briefing or something like that. Is that enough to preserve the issue for review? It's not, and for three reasons on that. And the evidence that you're talking about, Your Honor, comes in the four-page discussion. I think it's pages 8 through 12 or in that area of the response of summary judgment where it walks through. Because they make two references to practice, to the practice. That's absolutely correct. So with respect to Eric Nelmark, they talk about custom and practice, and then with respect to O'Toole, they talk about practice. Why wasn't that enough to put a district court on notice that this was something that may or may not be successful? That's a separate issue. Sure. But your first argument is that they never made the argument below. That's right. And I think it's probably better to say they didn't develop the argument below very well, but they did seem to raise it. Well, I think the development of the argument in the briefs and the underlying record goes into them not raising it. With Nelmark, the use of the phrase custom and practice doesn't tie to any label in Rule 406, and I'm not here to say that labels matter. I don't understand why it has to tie to 406. 406 is an issue about admissibility, and I don't see that anyone was contesting about admissibility. When I read the summary judgment order, the first thing I immediately thought of was, oh, this is an argument that this is what I would normally do, and so I must have done it. Logically, you can make that argument. This is what I do, and, therefore, I draw the inference. Whether you stamp 406 or habit on it, I don't see, that seems to me to be a red herring. Why am I wrong? Well, I think it gets beyond the label. So when you go beyond the one sentence about the custom and practice, with Eric Nelmark, for example, pages 19 and 20 of his deposition that they rely on, they ask him three questions as to what he would have done in a hypothetical situation. It's not a reflexive view or reflexive action. It may be insufficient to support an inference that they did, in fact, when they looked at this official statement, that they did, in fact, look at particular things. They may have factually not established a sufficient basis that, based on how they would normally do things, they did something here that could be reasonably inferred. But that seems to me to be the issue, and this whole thing about 406, or did you say magic words, seems to me to be a red herring. Well, the magic words I don't think goes far enough. I think that's one of three things, but the underlying evidence, the underlying evidence behind what the custom and practice is. Excuse me. How about the anguined factors? Did they need to be reviewed, in your view? Is that what you're arguing? Yes, I think the anguined factors, and I think the anguined factors are more just a reflection of the advisory committee rules in Rule 406. Let's assume for a second that they preserved the argument, and the evidence was what the evidence was. Why was that evidence insufficient to establish reliance? And that may be more useful for me, at least, to focus on whatever evidence was introduced, whether it establishes reliance or not. Because, well, let me start with Nelmark. In the case of Nelmark, the underlying evidence, the three questions that he was asked on pages 19 and 20 didn't go anywhere near habit. It asked what he would have done in a particular situation, and what he would have done would he have raised it with the supervisor. In addition, Nelmark's testimony was that this was not a reflexive action on his part. I mean, certainly he read a fair amount of official statements, but his testimony was, hey, once I saw this thing was rated A+, I wasn't quite as careful. I may not have read through the whole document. Can you address O'Toole's affidavit that the district court eventually decided not to consider? Sure. O'Toole's declaration was 180 degrees off from what he testified in his deposition. None of his declaration really goes to habit or customer practice. It's what he would have testified had he been asked certain questions. And in his declaration, he goes specifically what he would have relied on in the official statement. Now, going back to the deposition, which was a 30B6 deposition with one of the topics that was described with reasonable particularity, reliance, and for good reason, because that was part of the class definition for the fraud and negligent misrepresentation claims. So in the absence of O'Toole's, assume he's never been deposed, would his declaration have been sufficient to create a fact issue on  No. Well, actually, I think it might be. I mean, the problem with O'Toole's declaration, though, is that he phrases it, had I been asked, this is what I answered. No, I understand. I understand that the district court said, I'm not going to consider it because it's in contrast to your deposition testimony. Right. But let's assume that he should have considered it. If he should have considered it, it seems to me it's probably enough to get past summary judgment, isn't it? It might be. In particular, the paragraph where he lays out the, I mean, I guess if we had no summary or we had no deposition before. If it had been a sham or declared as a sham. Right. I mean, we're certainly in a closer call. So in order for us to uphold the reliance ruling of the district court, it seems necessary to uphold the sham affidavit ruling. I think that's right. And I think there's ample evidence. I mean, first of all, it's reviewed on abuse of discretion. And I think Judge Reyes was well within his discretion on declaring it a sham declaration. O'Toole was asked. We've also said that it should be applied with considerable caution because it really presents a risk that the district court is going to start to make credibility determinations. And so it has to be, you know, an absolutely clear contradiction between the two. And we've also said that without any credible explanation as to why it was different here, the declaration actually makes quite an effort to explain why it shouldn't be viewed as contradictory. And isn't the district court now making a credibility determination? I don't think so. Because this was a 30B6 deposition on the topic of reliance. O'Toole had reviewed the official statement in preparation of that deposition. And he was asked at least twice during the course of the declaration, what did you rely on on the official statement? And he couldn't point to anything. So then in justifying why they did a 180 in the declaration, they pointed to, well, this was class-based discovery, not merits discovery. I would have only been prepared for that on merits discovery. But that doesn't pass the straight-based test because reliance was part and parcel of the class definition. I mean, to have a class rep who was going to represent the defined class needed to have read and relied upon the official statement. Was this class for both at the time of that deposition, was it class on both the ASA or just common law? Just common law. The ASA had been deposed in 2018. Prior to the deposition. That's right. So that had been four years. So the class was solely about the fraud and the negligence representation claims. And reliance was key to the class rep. So the fact that he came into the deposition somewhat prepared. He read the official statement and wasn't able to point to anything that he relied upon. Two years later, we don't have any explanation other than, you know, because it was on class issues, but reliance was the class issue. So this is exactly, I mean, this is the Yeager case. And I see that my time is up, and I think any way that this is fun, it was a sham declaration. Judge Reyes was properly considered it as such, and summary judgment was proper. Thank you very much.  Just a moment on the statute of limitations issue. The cause of action accrues when a fraudulent practice is known or should be known. That's set forth in the statute. I would urge the panel to consider 44-2082, which sets forth the pleading standards in order for the plaintiffs to have sued Vieste and the underwriters for securities fraud. We would have had to set forth, it says, the complaint shall specify each alleged untrue statement or material omission and the reason or reasons why the statement or omission is misleading or the omission is material. We could not have known those things. We could not have pled those things until the 2017 order came out. A comment was made about, well, when were these statements false? Were they false when they were made, or were they false when we learned that they were false? Well, they were false when they were made. But still, the discovery rule applies. When should we have known that they were false? How much of a court ruling tells you that it was false? That's just a weird theory. Because we have unique facts, Judge Collins. But it defies the laws of causation. How can a court ruling that nobody knows what the court's going to say, you just know the underlying facts, determines, aha, now I know that in 2013 what they said was false. It seems I don't understand how that could be true. Either the facts as known in 2013 show that it's false or it's not. And what some court thinks about a dispute where it went through a lot of rounds and no one knew how it was going to come out, how could that retroactively establish a falsity in 2013? It doesn't retroactively establish a falsity. It puts us on notice of the falsity. But how could that be? This goes back to the question that Judge Hurwitz asked at the beginning. How could it be that a court pronouncement about the facts provides notice when the facts themselves don't? Judge Collins, what I will tell you is Judge Reyes looked at the same situation, and he says this doesn't tell us enough. This doesn't tell us that Vieste was at fault. That's why I started with that point. I see I'm very short on time, so let me just go very quickly to the reliance. I will say that, first of all, the O'Toole deposition testimony in and of itself is sufficient to show reliance. We never need to get to his declaration. There is nothing shameless. What's your best case for that? What's your best case for the habit evidence is sufficient here to establish reliance for this common law claim? Because Mr. O'Toole testified to what he does in these circumstances. But do you have an actual case to tell me, a precedent that supports with these kind of facts here? No, Your Honor, I don't beyond what's in the brief. Let me ask one more specific question. If we were to find, I'm just saying hypothetically, if we were to find that the S&P downgrade notice in 2014 was sufficient to establish inquiry notice, would that time bar all the claims? Because even a three-year claim would have run by that point. Is three years the longest statute of limitations we're dealing with here? Yes, it is. But inquiry notice wouldn't have triggered the accrual of the cause of action. But I understand that argument. But if we were to find that the cause of action accrued in 2014, everything would be time bar. I understand you don't think that premise is correct. But if that premise is true, then everything would be time bar. Three years is the longest statute of limitations. To put it differently, you're not making different arguments with respect to the accrual of your ASA claims and common law claims, are you? No. I understand Judge Reyes may have made a determination when he thought the common law claims accrued. But it's really the same argument, isn't it? In fact, Judge Reyes, I believe, agreed with Judge Bolton that the 2015 date would be the date, but it was a longer statute of limitations period. It was a three-year limitations period on the common law claims. But what Judge Reyes obviously disagreed with Judge Bolton on was when we knew that Fiesta was the one at fault. I have just one last parting comment, and that is because this was not fully developed in the briefing, there was a challenge to the Nelmark testimony, saying that he didn't testify that he had read the official statement. He did testify that he read the bond rating report. The Allstate case develops the concept of indirect reliance. Same situation where an investor relied on a bond rating, which in turn relied on the official statement and the underlying documents, and that was sufficient to get past summary judgment. Thank you. Thank you. Thank you, Mr. Golder and Mr. Feltes and Mr. Smiley. We appreciate the oral argument presentations made today. The case across First Bank and Nancy Hanna v. Fiesta, Herbert Sims and William Sims is now submitted, and we are adjourned. Thank you.
judges: MURGUIA, HURWITZ, COLLINS